NOTICE
Decision filed 09/09/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 220226-U

NO. 5-22-0226

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* K.J., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Macon County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 19-JA-89 |
| | ) | |
| Melissa J., | ) | Honorable |
| | ) | Thomas E. Little, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

PRESIDING JUSTICE BOIE delivered the judgment of the court.
Justices Cates and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm the circuit court's judgment where the circuit court's findings that the respondent was an unfit person based upon its determination that the respondent failed to make reasonable progress for the return of the minor child during any nine-month period following the adjudication of neglect and that termination of the respondent's parental rights was in the best interests of K.J. were not against the manifest weight of the evidence.

¶ 2    The respondent, Melissa J., is the natural mother of K.J., born March 19, 2014, (minor child) and N.P., born October 20, 2017.[1] On March 24, 2022, the circuit court entered a judgment terminating the respondent's parental rights based upon its findings that the respondent was an

_____

[1]The minor child, N.P., is not at issue in this appeal and our recitation of the background will focus on K.J. and only refer to N.P. when necessary.

1

unfit person, and that termination of her parental rights was in the best interests of the minor child. The respondent appeals the circuit court's judgment, arguing that the State failed to prove that the respondent had not made reasonable progress towards the return of the minor child during any nine-month period following the adjudication of abuse or neglect. The respondent also argues that the circuit court erred in finding that the respondent had not made reasonable efforts to correct the conditions that were the basis for the removal of the minor child and erred in finding that the respondent had not maintained a reasonable degree of interest, concern, or responsibility as to the welfare of the minor child. For the following reasons, we affirm the judgment of the circuit court.

¶ 3                                          I. BACKGROUND

¶ 4       K.J. was taken from the respondent and placed in foster care after her well-being came to the attention of the Illinois Department of Children and Family Services (DCFS). On April 1, 2019, the State filed a juvenile petition[2] pursuant to the Juvenile Court Act of 1986 (Act) (705 ILCS 405/1-1 *et seq*. (West 2018)). The juvenile petition alleged that the minor child was neglected as defined in sections 2-3(1)(a) of the Act (*id*. § 2-3(1)(a)) and 2-3(1)(b) of the Act (*id*. § 2-3(1)(b)), because law enforcement had been involved in a domestic dispute call between the respondent and her paramour, Nathan P. (Nathan), on March 29, 2019. Law enforcement observed that the respondent's home was in a deplorable condition and had no running water. The minor child was filthy, and both the respondent and Nathan were intoxicated to the point that neither were capable of caring for the minor child. As such, the juvenile petition alleged that the minor child was neglected due to not receiving the proper care necessary for the minor child's well-being pursuant to section 2-3(1)(a) of the Act, and due to being in an injurious environment pursuant to section 2-3(1)(b) of the Act. *Id*. § 2-3(1)(a), (1)(b). The juvenile petition further alleged that the minor child

_____

[2]The juvenile petition filed on behalf of K.J. was also filed against K.J.'s natural father, but the termination of K.J.'s natural father's parental rights are not at issue in this appeal.

2

was abused as defined in section 2-3(2)(ii) of the Act, due to a parent, family member, and/or a paramour of the minor child's parent that created a substantial risk of physical injury by other than accidental means. *Id*. § 2-3(2)(ii).

¶ 5     The same day, a shelter care report and a parent-child visitation plan were filed on behalf of the minor child by DCFS. The circuit court entered a temporary custody order granting temporary custody of the minor child to the Guardianship Administrator of DCFS. The circuit court also entered an order appointing a court appointed special advocate (CASA) for the minor child granting Macon County CASA access to all records and files with respect to this matter.

¶ 6     The respondent admitted to the DCFS worker that the respondent's parental rights had been terminated regarding some of her other children. The respondent reported being diagnosed with depression, bipolar disorder, and dysthymic disorder; however, she stated that she would not take the medications for her mental health issues. Further, the respondent reported that the minor child had special needs, but that the respondent had not been able to become stable enough to place herself and the minor child in services. The respondent stated that she had moved from the state of Illinois after her previous six children were removed from her care in 2009. The respondent further reported that she had moved numerous times, had not actively engaged in services or visits, and had remained unemployed and unstable. Further, the respondent indicated that she had a history of domestic violence with Nathan and her other paramours.

¶ 7     On May 6, 2019, the State filed an amended juvenile petition in this matter making the same allegations as the first juvenile petition. On July 11, 2019, the circuit court entered an adjudicatory order based upon a stipulation to the allegations contained in the amended juvenile petition. Based on the respondent's admission, the circuit court adjudicated the minor child neglected as defined in section 2-3(1)(b) of the Act, in that the respondent and Nathan's conduct had placed the minor child in an injurious environment. *Id*. § 2-3(1)(b).

3

¶ 8     On August 9, 2019, DCFS filed a dispositional report and integrated assessment dated August 7, 2019, with the circuit court. The dispositional report and integrated assessment indicated that an initial child and family team meeting was held on April 11, 2019, and that the respondent was present and discussed visitation and the integrated assessment. A second child and family team meeting occurred on May 1, 2019, with the respondent present and where a service plan was developed. Pursuant to the service plan, the respondent was recommended to engage in parenting services, mental health services, maintain stability and independence, engage in a substance abuse evaluation, and maintain contact with her caseworker. Further, the respondent was required to comply with her visitation plan and to provide safe and appropriate interactions with the minor child during all of their visits.

¶ 9     According to the dispositional report, the respondent was referred to parenting services and had begun meeting with a parenting educator on May 13, 2019. The DCFS caseworker contacted the parenting educator on July 3, 2019, and was informed that the respondent was no longer meeting with the educator. The respondent was also referred to family habilitation services to assist with employment, housing, and in meeting her financial needs.

¶ 10    Further, the respondent was referred for a substance abuse/mental health assessment, which she completed on April 15, 2019. The dispositional report cited "reports from Wisconsin," where the respondent had previously resided, which indicated that the respondent had a history of hotline reports based on her parenting abilities being impaired from chronic alcohol use, and reports from the caseworker and service providers indicated difficulties in interactions with the respondent due to her being under the influence of alcohol. Despite these reports, the respondent denied any substance use besides occasionally using alcohol and, therefore, the assessor did not recommend the respondent complete any substance abuse treatment. While the respondent completed drug screenings on May 6 and 30, 2019, which yielded negative results, she failed to appear for random

4

drug screenings on May 14 and June 27, 2019. The caseworker indicated that it had been difficult to keep in touch with the respondent for subsequent testing. Based upon these factors, the respondent was referred to complete another assessment and encouraged to be forthcoming and engage in treatment; however, she failed to complete that assessment.

¶ 11 The dispositional report also indicated that the respondent would be referred for individual mental health treatment based on the results of the integrated assessment and the fact that the respondent carried a mental health diagnosis for which she received social security benefits. Lastly, it was noted that the respondent had pending criminal charges for child endangerment that needed to be resolved.

¶ 12 The respondent had weekly supervised visitation scheduled with the minor child, which she consistently attended until June 20, 2019. The respondent was provided bus tokens to assist her in attending the visitations; however, she had not attended a visitation since June 20, 2019, without offering any explanation as to why she had not attended. The caseworker discussed visitation with the respondent and encouraged her to attend. The dispositional report of August 9, 2019, recommended a permanency goal of return home within 12 months to give the respondent time to correct the conditions that led to the minor child being taken into protective custody.

¶ 13 The circuit court entered an order of disposition on August 14, 2019, and found the respondent unable, for reasons other than financial circumstances alone, to care for, protect, train, educate, supervise, or discipline the minor child. The circuit court further found that reasonable efforts had been made to keep the minor child in the home, but they had not eliminated the necessity for the removal of the minor child from the home, and that leaving the minor child in the home was contrary to the health, welfare, and safety of the minor child. Based upon those findings, the circuit court found it to be in the best interests of the minor child to grant custody and guardianship to DCFS. The circuit court's dispositional order also directed that the respondent

5

would have supervised visitation and ordered her to cooperate fully and completely with DCFS, specifically, to comply with the terms of the service plan or risk the loss of custody and/or the termination of her parental rights regarding the minor child.

¶ 14   On December 30, 2019, DCFS filed a permanency review report with the circuit court. The permanency review report indicated that the respondent had reported complications with her health, being diagnosed with congestive heart failure. According to the respondent, she had been hospitalized numerous times since the dispositional report, but her condition had stabilized. The respondent reported that she had been battered by Nathan on October 10, 2019; was the victim of a sexual assault on October 28, 2019; was residing in Peoria, Illinois; and planned to stay there until the perpetrator of the sexual assault was arrested. In addition, the respondent reported that she was held at gunpoint on November 6, 2019, and was later transported to Wisconsin by a friend, where she was currently residing. The respondent provided documentation from the Mayo Clinic in Eau Claire, Wisconsin, of her diagnosis and reported that she had transferred her medical aid benefits to Wisconsin to prepare for heart surgery.

¶ 15   The permanency review report further indicated that the respondent had completed a second substance abuse/mental health assessment and completed a treatment plan on September 10, 2019. The respondent was referred for mental health case management, medication monitoring, individual counseling, and community supportive services. However, the respondent only attended one session after the treatment plan and did not continue to attend the sessions. Accordingly, the respondent was discharged from treatment on December 17, 2019, and was rated as unsatisfactory in her mental health objective. Also, the respondent was referred to attend early intervention services for substance abuse treatment; however, she had not followed through with substance abuse treatment at that time. The respondent informed the treatment provider of her heart condition diagnosis that prevented her from attending treatment.

¶ 16    The permanency review report further indicated that the respondent had missed parenting appointments during the month of August 2019, due to her health complications. The respondent did re-engage with parenting services in September 2019, but only attended them for a short time before moving to Wisconsin. The respondent had completed eight sessions in the parenting curriculum; however, she was rated as unsatisfactory in the parenting objective in her service plan. It was also noted that the respondent continued to have pending criminal charges for child endangerment that needed to be resolved.

¶ 17    The permanency review report indicated that the respondent had remained homeless during the reporting period and was staying with "a friend." The respondent did meet with the housing coordinator and applied for housing but learned that she had an outstanding $3985 power bill that made her ineligible for public housing assistance. The respondent re-engaged in visitation with the minor child during the reporting period. The respondent was appropriate, engaged in interacting with the minor child, and provided snacks. However, the respondent had not visited with the minor child since the respondent moved in October 2019, although she reported that she planned to visit on January 8, 2020. The respondent was rated as unsatisfactory in visitation. The December 30, 2019, permanency review report recommended a permanency goal of return home within 12 months.

¶ 18    On January 6, 2020, CASA filed its initial report with the circuit court. The report stated that the minor child was thriving in her new environment, attended school, and enjoyed her friends there. The minor child was participating in a cheer group at school and loved living in the new home. She was excited to visit with the respondent, but the respondent was not appearing for visitations, which made the minor child sad, moody, and act out. The minor child's immunizations were up to date, and she was doing well enough in school that her foster parent hoped to take her

7

out of special classes the next semester. According to CASA, they had no concerns regarding the minor child at that time.

¶ 19    The CASA report further stated that the respondent presented herself as very agitated and defensive at the first child and family team meeting. She had missed visitation and failed to call because of her health. The respondent informed CASA that her doctor had stated that the respondent needed to stay away from stressful situations and that CASA was stressing her out. The respondent then started seeing the minor child, but not very regularly, so the transporters stated that they would wait until the respondent appeared before they would drive the minor child to the visitations. The report indicated that CASA was concerned with the respondent's inconsistent visits and by her not trying to correct the conditions that brought the minor child into care. The CASA report recommended a permanency goal of return home within 12 months.

¶ 20    The circuit court entered an initial permanency order pursuant to section 2-28(2) of the Act on January 8, 2020. 705 ILCS 405/2-28(2) (West 2020). The circuit court considered the December 30, 2019, DCFS permanency review report and the January 6, 2020, initial CASA report. The circuit court found that the respondent had not made reasonable and substantial progress towards the return home of the minor child and had not made reasonable efforts toward returning the minor child home. The circuit court directed that the minor child remain in the custody of DCFS with a permanency goal of return home within 12 months.

¶ 21    On June 26, 2020, CASA filed its second report with the court. The second report stated that the minor child had been attending school where she was doing well. She had also been attending an after-school program and had been enrolled in a ballet class that she loved. Her foster brothers were great with her with the usual amount of child squabbling and storytelling; however, it was apparent the amount of love within the home. Covid-19 had presented challenges with no school attendance, but the foster parent had been working from home and the foster brothers had

8

been a big help with this issue. The minor child was having telephone calls rather than in-person visits with the respondent, which had been hard on the minor child since the respondent was not consistent in making the telephone calls. According to CASA, they had no concerns regarding the minor child at that time.

¶ 22 The second report then stated that the respondent had been granted telephone visits with the minor child when the Covid-19 pandemic hit. The respondent had lost in-person visitation prior to Covid-19 due to her repeatedly not appearing for visitations, which wasted resources and upset the minor child. The respondent had been granted two-hour telephone/FaceTime visits with the minor child but had missed most of the visits. Further, the respondent had not engaged in her service plan. The second report indicated that it was concerned with the respondent's inconsistent visits, by her not trying to correct the conditions that brought the minor child into care, and by her not even trying to work on the service plan. The second report recommended a permanency goal of return home within 12 months.

¶ 23 On June 29, 2020, DCFS filed a second permanency review report with the circuit court. The second permanency report stated that the respondent had reported experiencing multiple traumatic incidents and had been struggling with her personal health. The respondent continued to reside with family members in Wisconsin, and on May 22, 2020, she reported being admitted to a hospital in Saint Paul, Minnesota, for her scheduled heart surgery, which was completed. On June 16, 2020, the respondent indicated that she had planned to return to Decatur, Illinois; however, on June 22, 2020, she reported that she was "slapped and punched" at the hospital and was attempting to locate a domestic violence shelter. At the time of the report, the respondent was living in Minnesota.

¶ 24 As to the respondent's substance abuse/mental health goals, there had been no progress made during the reporting period regarding the respondent's substance abuse treatment. The

respondent reported that she had made attempts to locate a substance abuse treatment while in Wisconsin, but had failed to provide any proof of engaging in any such treatment. Further, the respondent had indicated that her health condition and homelessness prevented that engagement. As to the respondent's mental health services, the second permanency report indicated that the respondent reported receiving medication for "depression" while in Wisconsin and that she would request that her records be sent to DCFS to verify this information. DCFS had not received any medical or mental health records to verify treatment at the time of the report. Accordingly, the respondent was rated as making unsatisfactory progress in her mental health treatment.

¶ 25     As to the respondent's parenting education, the second permanency review report indicated that the respondent had not engaged in any parenting education during the current reporting period and was rated as overall unsatisfactory in this service area. The second permanency report also noted that the respondent continued to have pending criminal charges for child endangerment that needed to be resolved. It further noted that the respondent had not engaged in any domestic violence supportive services, and she was rated as making unsatisfactory progress in this service area. As to the respondent's housing, the second permanency report stated that she was living in Saint Paul, Minnesota, as of June 2020.

¶ 26     With regard to the respondent's visitation with the minor child, the second permanency review report indicated that the respondent was unable to attend the January 8, 2020, visitation due to her heart condition. The respondent was provided weekly video visitation with the minor child during the Covid-19 pandemic, which she cancelled four times due to her heart condition, but her attendance was consistent in the other weeks. The foster parent reported that the respondent was engaging with the minor child during the video visitation. The second permanency review report recommended a permanency goal of return home within 12 months.

¶ 27    On July 1, 2020, the circuit court entered a second permanency order. The circuit court considered the June 26, 2020, second CASA report and the June 29, 2020, DCFS second permanency review report. The second permanency order indicated that the respondent had not made reasonable and substantial progress towards the return home of the minor child and had not made reasonable efforts toward returning the minor child home. The circuit court entered a permanency goal of substitute care pending determination of termination of parental rights and set the matter for a permanency hearing.

¶ 28    On September 24, 2020, DCFS filed a family service plan dated February 28, 2020, which contained the same or similar information as the DCFS integrated assessment of August 9, 2019, and the two DCFS permanency review reports filed with the circuit court. The service plan required the respondent to obtain stable housing and income; engage in mental health services; obtain a psychological evaluation and psychiatric assessment; engage in parenting services; and demonstrate safe parenting techniques. Further, the respondent was directed to complete a substance abuse assessment, comply with random drug testing, and follow all recommendations made by the substance abuse assessment. The service plan also required the respondent to receive services to enhance her awareness of how domestic violence in relationships impacted her safety, as well as her ability, to safely parent the minor child. The DCFS service plan indicated that the respondent had not engaged in the recommended services and, therefore, had made unsatisfactory progress. A copy of the family service plan was provided to the respondent on July 27, 2020.

¶ 29    On December 22, 2020, DCFS filed a third permanency review report with the circuit court. The third permanency report noted that the respondent had returned to Decatur, Illinois, and that she had reported ongoing medical issues with her heart that resulted in her being in and out of the hospital. The respondent had not provided DCFS with any hospital documentation, had been inconsistent with meeting with the DCFS caseworker, and had been inconsistent in providing her

contact information or location. A quarterly child and family team meeting was held on December 14, 2020, to discuss the respondent's services, visitation, and the minor child's current status in the foster home, but the respondent was not present for this meeting.

¶ 30    As to the respondent's substance abuse services, the third permanency review report added that, although the respondent had reported that she had completed a substance abuse assessment while living out of state, once she returned to Decatur, she had been discharged unsuccessfully from substance abuse treatment. The respondent entered a DETOX program in September 2020, but left that treatment after five days and did not return for further treatment. The respondent failed to provide any proof of ongoing engagement in treatment and indicated that her health condition and homelessness prevented her from ongoing engagement in treatment.

¶ 31    Regarding the respondent's parenting education, the respondent cancelled meeting with the parenting educator on three occasions and did not show on eight occasions during the reporting period. The parenting educator had not heard from the respondent to reschedule the parenting sessions. Further, the respondent only completed 7 out of 32 parenting sessions during the time she had been involved with DCFS. The respondent had indicated to the DCFS caseworker that her health condition prevented her from consistently engaging in services. Accordingly, the respondent was rated as overall unsatisfactory in this service plan objective

¶ 32    As to the respondent's mental health services, the respondent continued to be recommended to engage in mental health treatment and was referred for such treatment. The respondent spoke with her counselor over the telephone but did not complete a mental health assessment or attend a counseling session. Accordingly, the respondent was unsuccessfully discharged from mental health services and was rated as making unsatisfactory progress in her mental health treatment.

12

¶ 33 The third permanency report also noted that the respondent had pleaded guilty to the criminal charge of child endangerment and was placed on 24 months specialty probation, with a condition of probation that required the respondent to complete a substance abuse assessment and comply with DCFS. It also noted that the respondent still had not engaged in any domestic violence supportive services and was rated as making unsatisfactory progress in this service area.

¶ 34 As to the respondent's housing, the third permanency review report added that the assigned housing advocate had been unable to reach the respondent. The housing advocate was eventually able to schedule a November 19, 2020, meeting with the respondent; however, she did not show for the appointment. The respondent was linked with a housing program which confirmed that, at that time, the respondent was homeless but had been working on obtaining a one-bedroom apartment, once available.

¶ 35 Concerning the respondent's visitation with the minor child, the third permanency review report stated that the respondent had been offered 11 visits during the reporting period but had only attended 6 in-person visits. The respondent had two no shows and three cancelled visits. The last visit had been scheduled for November 24, 2020, but the respondent had failed to appear and had not contacted DCFS to confirm future visits. When the respondent did attend a visit, she greeted the minor child and brought her food. The respondent did not ask the minor child if she needed to use the bathroom, and there were concerns that the respondent did not pay attention to the minor child during the visits. Further, it was reported that the respondent needed assistance with caring for the minor child due to her heart condition. The third permanency review report recommended a permanency goal of substitute care pending court determination on termination of parental rights.

¶ 36 On December 24, 2020, CASA filed its third report with the circuit court. The third report stated that the minor child was a thriving six-year-old who was doing well overall. She loved to

dance and was taking dancing, cheerleading, and hip-hop classes, which also helped her to unleash energy and with the discipline required with the team routines. She dearly loved her two foster brothers and they, in turn, doted on her. Visits with the respondent had been challenging since the respondent would not show for the visits after the minor child was driven to Decatur. When the visits did occur, the minor child experienced behavior changes and acted out afterwards. This required much patience and time for the foster parent to settle the minor child down. The minor child loved to show CASA her dance steps, and the advocate believed that the minor child was "coming out of her shell" and "beginning to shine more through her activities." The minor child was happy living in her foster placement and adored her foster parent and brothers. According to CASA, they had no concerns regarding the minor child at that time. The third report indicated that CASA was concerned with the respondent's inconsistent visits and by her not attempting to correct the conditions that brought the minor child into care. The December 24, 2020, third CASA report recommended a permanency goal of return home within 12 months.

¶ 37    On December 30, 2020, the circuit court entered a third permanency order. The circuit court considered the December 22, 2020, DCFS third permanency review report and the December 24, 2020, third CASA report. The third permanency order indicated that the respondent had not made reasonable and substantial progress towards the return home of the minor child and had not made reasonable efforts toward returning the minor child home. The circuit court entered a permanency goal of substitute care pending determination of termination of parental rights and set the matter for a permanency hearing.

¶ 38    On June 23, 2021, DCFS filed a fourth permanency review report with the circuit court. During the reporting period, the respondent continued to be inconsistent in meeting with the caseworker and providing contact information or the respondent's location. This made it difficult for the caseworker to engage the respondent in services and visitation. A child and family team

14

meeting was held on June 14, 2021, to update the respondent's services, the placement of the minor child, and the progress towards permanency. The respondent was not present for the meeting.

¶ 39    As to the respondent's substance abuse services, the fourth permanency report indicated that the respondent had again made no progress regarding her substance abuse objective. The respondent failed to provide any proof of engaging in treatment and indicated that her health condition prevented her from ongoing engagement and progress in treatment. As to the respondent's parenting education, the respondent had not engaged in any of the services. Further, the respondent had not participated in parenting services for over a year and was rated as overall unsatisfactory in this service area. As to the respondent's mental health services, the respondent had not been enrolled in counseling services for over a year and was rated as making unsatisfactory progress in her mental health treatment. The fourth permanency report also noted that the respondent still had not engaged in any domestic violence supportive services and was rated as making unsatisfactory progress in this service area.

¶ 40    The fourth permanency report noted that the respondent had secured housing and that her housing worker had met with the respondent in March 2021, when a housing lease was signed. The respondent, however, failed to show for a scheduled appointment in April 2021. The housing worker was able to tour the respondent's apartment on May 11, 2021, and create a budget with the respondent. However, the respondent again missed a scheduled appointment on May 18, 2021, and had not met with the housing worker in June 2021, or prior to March 2021.

¶ 41    As to the respondent's visitation with the minor child, the fourth permanency report noted that the respondent was offered monthly visits, and attended the visitation in May 2021, but did not attend in April 2021, citing medical issues. When the respondent had attended the visits, she had not engaged with the minor child, and it seemed that it was a burden for the respondent to be there. The respondent had continually questioned the minor child during the visits. When

15

suggestions were made on how the respondent could better engage with the minor child, the respondent stated that she felt that the staff were "being mean to her." The fourth permanency review report recommended a permanency goal of substitute care pending court determination on termination of parental rights.

¶ 42 On June 28, 2021, CASA filed its fourth report with the court. The fourth report stated that the May 2021 visit with the respondent went better with the minor child. According to CASA, they had no concerns regarding the minor child at that time. The fourth report indicated that the respondent's visits had been changed to monthly since she was not showing up for the weekly visits, which created great anxiety and stress on the minor child. Even with the monthly visits, the respondent had not been consistent, and when she had attended, she had not been engaging with the minor child. The respondent did sign a lease for a new apartment; however, as of June 14, 2021, she had not completed any of the services recommended in her service plan. The fourth report indicated that CASA was concerned with the respondent's inconsistent visits and by her not correcting the conditions that brought the minor child into care. The fourth CASA report recommended a permanency goal of substitute care pending court determination on termination of parental rights.

¶ 43 On June 30, 2021, the circuit court entered a fourth permanency order. The circuit court considered the June 23, 2021, DCFS fourth permanency review report and the June 28, 2021, fourth CASA report. The fourth permanency order indicated that the respondent had not made reasonable and substantial progress towards the return home of the minor child and had not made reasonable efforts toward returning the minor child home. The circuit court entered a permanency goal of substitute care pending determination of termination of parental rights and set the matter for a permanency hearing.

¶ 44    On August 13, 2021, the State filed a motion seeking a finding of unfitness and permanent termination of parental rights. The State's motion indicated that on July 11, 2019, the circuit court entered an adjudicatory order finding the minor child to be neglected and that on August 14, 2019, a dispositional order naming DCFS as guardian of the minor child was entered. The State's motion further stated that the respondent was an unfit person as described within section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)) and section 2-29 of the Act (705 ILCS 405/2-29 (West 2020)), as follows:

"A. Pursuant to 750 ILCS 50/1(D)(b), [the respondent] ha[s] failed to maintain a reasonable degree of interest, concern, or responsibility as the minor's welfare.

B. Pursuant to 750 ILCS 50/1(D)(m)(i), [the respondent] ha[s] failed to make reasonable efforts to correct the conditions that were the basis for the removal of the minor from the parent during any 9 month period following the adjudication of neglect and/or abuse and or dependency under the Juvenile Court Act of 1987.

C. Pursuant to 750 ILCS 50/1(D)(m)(ii), [the respondent] has failed to make reasonable progress toward the return of the minor to the parent during any 9 month period following the adjudication of neglect and/or abuse and/or dependency under the Juvenile Court Act of 1987. The 9 month period is: July 11, 2019–April 11, 2020.

***

E. Pursuant to 750 ILCS 50/1(D)(m)(ii), [the respondent] has failed to make reasonable progress toward the return of the minor to the parent during any 9 month period following the adjudication of neglect and/or abuse and/or dependency under the Juvenile Court Act of 1987. The 9 month period is: April 11, 2020–January 11, 2021.

***

G. Pursuant to 750 ILCS 50/1(D)(m)(ii), [the respondent] has failed to make reasonable progress toward the return of the minor to the parent during any 9 month period following the adjudication of neglect and/or abuse and/or dependency under the Juvenile Court Act of 1987. The 9 month period is: November 11, 2020–August 11, 2021."

As such, the State requested that the respondent be adjudged an unfit person, that all the respondent's parental rights and responsibilities of the minor child be terminated, and that DCFS be appointed guardian with authorization to consent to the adoption of the minor child.

¶ 45 On November 22, 2021, DCFS filed its fifth permanency review report with the circuit court. The fifth permanency report referenced the same information and incidents regarding the respondent contained in the original dispositional report and the previously filed permanency review reports. A child and family team meeting was held on November 19, 2021, to update the respondent's services, the placement of the minor child, and the progress towards permanency, but the respondent was not present for the meeting.

¶ 46 The fifth permanency report indicated that the respondent was still accountable to random drug screening, and during that reporting period, DCFS had requested that the respondent complete screenings on September 24, 29, and November 16, 2021. The respondent failed to complete any of the requested drug screenings, reporting that her failure to complete the screenings was due to being out of town or being in the hospital. However, the respondent failed to provide any medical documentation to substantiate her reports.

¶ 47 Also, during that reporting period, the respondent had not engaged in any parenting services and had been consistently disengaged from parenting services for over a year. Due to her lack of engagement, the respondent was unsuccessfully discharged from parenting services. It was reported, however, that the respondent had written a letter asking to re-engage in services and that

18

request was being assessed and considered at that time. The respondent was rated as making unsatisfactory progress overall toward her parenting services goal.

¶ 48   As to the respondent's mental health services, the respondent had not been enrolled in counseling services for over a year but did complete a mental health assessment on October 22, 2021. The respondent, however, did not return to create any kind of treatment plan or engage in any of the recommended services. The respondent initially reported taking Steriline for the treatment of her depression, but later reported that she was not taking her medication, reporting that it had been stolen in September/October 2021. It was confirmed that the respondent had not been compliant with taking her medications as prescribed or attending her recommended psychiatric follow up appointments. Accordingly, the respondent was assessed as making unsatisfactory progress toward her mental health goal.

¶ 49   The fifth permanency report further noted that the respondent had pleaded guilty to the criminal charge of child endangerment and had been placed on 24 months specialty probation, with the requirements to complete a substance abuse assessment and comply with DCFS. It was noted that the respondent was unsuccessfully discharged from probation due to her arrest for domestic violence. On April 15, 2021, the respondent pleaded guilty to domestic battery and was ordered to serve two days in jail. The fifth permanency report also noted that the respondent had not engaged in any domestic violence prevention supportive services. She was referred to the services, however, due to her domestic violence arrest, but DCFS could not provide services. The respondent had then been referred to another provider for services, but reported that she had not contacted that agency to set up services. The respondent was assessed as making unsatisfactory progress toward her domestic violence goal.

¶ 50   The fifth permanency report further noted that the respondent had been discharged from housing services as of October 5, 2021, due to lack of communication. The respondent had been

recently evicted from her apartment due to payment issues and was homeless. She reported that she was not willing to stay at the shelter house due to her being forced to leave at 6 a.m., having to stay at another facility all day, and returning to the shelter by 5 p.m. The respondent stated that she believed this to be too much for her health to handle and that she was "staying from house to house."

¶ 51 Concerning the respondent's visitation with the minor child, the fifth permanency report noted that during the reporting period, the respondent attended three out of seven visits. She had not appropriately engaged with the minor child during the visits. When the respondent had been asked about her lack of attendance to the visits, she reported that her absence was due to being sick or in the hospital, stating "first of all I have congestive heart failure and even when I'm at visits, I feel sick and I still interact with my kids." It was again noted that she had never provided any documentation to DCFS regarding her health conditions or hospitalizations. The fifth permanency review report recommended a permanency goal of substitute care pending court determination on termination of parental rights.

¶ 52 On November 29, 2021, CASA filed its fifth report with the court. The fifth report noted that the respondent had not been consistent with visitation and that the minor child would get upset when she expected a visit and was then not picked up from school to attend the visit. According to CASA, they had no concerns regarding the minor child at that time. The fifth report indicated that CASA was concerned with the respondent's inconsistent visits and by her not correcting the conditions that brought the minor child into care. The fifth CASA report, filed November 29, 2021, recommended a permanency goal of substitute care pending court determination on termination of parental rights.

¶ 53 On December 1, 2021, the circuit court entered a fifth permanency order. The circuit court considered the November 22, 2021, DCFS fifth permanency review report and the November 29,

2021, fifth CASA report. The fifth permanency order indicated that the respondent had not made reasonable and substantial progress towards the return home of the minor child and had not made reasonable efforts toward returning the minor child home. The circuit court entered a permanency goal of substitute care pending determination of termination of parental rights and set the matter for a permanency hearing.

¶ 54    On January 20, 2022, CASA filed its sixth report with the court. The sixth report noted that the minor child was thriving in the family dynamics of her foster family and was happy, healthy, and generally well-adjusted. The entire foster family had recently taken a vacation. The visitations upset the minor child and she had still acted out after any contact with the respondent. According to CASA, they had concerns about how the visits with the respondent upset the minor child. During the reporting period, the respondent only attended one in-person visit and one video visit. She had not done anything on her service plan. The sixth report indicated that CASA was concerned with the respondent's inconsistent visits and by her not correcting the conditions that brought the minor child into care. The sixth CASA report of January 20, 2022, recommended termination of parental rights.

¶ 55    The circuit court conducted a fitness hearing January 26, 2022. At the fitness hearing, the circuit court heard testimony from Emily Fraser. Fraser testified that she was a visitation specialist with Webster Cantrell Youth Academy, had been employed with the Academy for 2½ years, and had handled the visitations involving the minor child and the respondent since August 17, 2019. Fraser testified that in 2019, the respondent had one supervised visit per week, which Fraser supervised. Fraser testified that the visits never progressed to unsupervised, overnights, or extended visits. According to Fraser's testimony, the respondent's attendance for visitations was sporadic after August 2019. Fraser stated that interventions were needed during the visits due to the respondent's lack of engagement and irritated behaviors. Fraser testified that the respondent

21

would not pay attention to the minor child and would sit on the couch while the minor child played, not spending time with her. Fraser observed the respondent sometimes redirected the minor child during the visits.

¶ 56    Fraser's testimony continued, stating that the respondent still had weekly scheduled visits in 2020, but that the respondent stopped attending the visits in November 2019. The respondent did not resume visits until September 2020, and then her visitation attendance was sporadic. During the visits in September and October 2020, the respondent continued to sit on the couch and did not pay attention to the minor child. According to Fraser's testimony, the visitation changed in December 2020, from weekly to twice a month. Again, Fraser testified that the respondent's attendance was sporadic. At that point, due to the respondent's numerous no calls and no shows, she was required to verify ahead of time that the visit would occur. Fraser testified that the visits during this time were similar to the previous visits, in that the respondent minimally interacted with the minor child.

¶ 57    Fraser testified that the respondent's visits were changed to once per month between February and March 2021. Fraser testified that the respondent attended about half of the visits, that she seemed to be more irritated as time went on, and that there were a couple of occasions when the respondent would not engage the minor child. Fraser further stated that she did not observe any type of improvement in the respondent's interaction or relationship with the minor child between August 2019 and August 2021.

¶ 58    On cross-examination, Fraser testified regarding her training for her position and that there were times when the respondent did interact with the minor child, doing such things as painting her nails and doing her hair once. Fraser also stated that the respondent did bring food and things in order to engage the minor child. Further, the visitations occurred within an inside facility, lasted two hours, and that the minor child looked forward to seeing the respondent. When questioned by

the guardian *ad litem*, Fraser testified that her responsibilities were to supervise visitation between parent and child, to make sure the child was safe, and to watch for engagement to make sure the parent was using their full opportunity. Fraser reiterated that the respondent was inconsistent and did not show up for every visit. She further stated that there were difficulties during the visits, that the respondent was never given more than two hours once per week, and that the visits never left the facility.

¶ 59    The circuit court then heard testimony from Amanda Aubert, who testified that she was a Norman Housing supervisor at Webster Cantrell Advocacy. She stated that she assisted the respondent with housing services from July 15, 2020, until October 5, 2021, attempting to aid the respondent in obtaining housing or funds for housing. Aubert testified that it was complicated obtaining housing for the respondent due there being inconsistency with their meeting and communication, the respondent having an outstanding power bill, and the respondent owing money to public housing in Wisconsin. Accordingly, Aubert stated that she was unable to obtain housing; however, the respondent was able to obtain housing through Homeward Bound. According to Aubert's testimony, there were months when she would try to communicate with the respondent and many months of noncommunication, which led to several months of not meeting with the respondent. Aubert testified that when dealing with issues regarding the obtainment of housing for someone, communication is something that you "have to stay on." She stated that due to the respondent's lapses in meeting and communicating with Aubert, she essentially had to start over each time. Aubert testified that she had completed a couple of budgets with the respondent, but that Aubert did not observe any positive impact due to the respondent's lack of communication. Aubert testified that the respondent had not been employed, received SSI income, and that she had some medical issues that would take up her time. Finally, Aubert stated that the respondent never said anything about why she was not taking advantage of the services Aubert offered.

¶ 60    On cross-examination, Aubert testified that she was aware the respondent signed a lease in February 2021 for public housing through Homeward Bound. The guardian *ad litem* questioned Aubert regarding the difference between the respondent obtaining housing through Homeward Bound versus what Aubert would be able to help the respondent obtain. Aubert explained that Norman Housing assisted in paying some bills but, unfortunately, the respondent's outstanding power bill was close to $4000, and that Norman Housing would only pay if it was within 90 days of return home. Aubert further stated that Homeward Bound was able to assist the respondent with the outstanding power bill and the money owed to public housing. Aubert testified that she continued through October 2021 with her attempts to engage, help stabilize, and obtain stable housing for the respondent, but there was still a lack of communication.

¶ 61    The circuit court next heard testimony from Amy Schroeder, who testified that she was a child welfare specialist with DCFS and had been the primary caseworker in this case since September 2020. Schroeder also stated that she was familiar with what occurred in the case prior to September 2020. According to Schroeder's testimony, the respondent's original recommended services included cooperating with DCFS, maintaining personal stability like housing, substance abuse services, mental health and counseling services, parenting education, and domestic violence services. These services remained the goals throughout the pendency of the case, and the goals regarding the respondent's criminal and legal issues were added later. Schroeder explained that she was unable to meet with the respondent during the Covid-19 pandemic, so communication was by telephone and text message. She further stated that she had met with the respondent one time in person.

¶ 62    Schroeder testified that the respondent's housing was an issue from the beginning of the case. The respondent did not have any kind of stable housing since July 2021, but she did sign a housing lease with Homeward Bound in 2021. Schroeder stated that the respondent's service plan

goal regarding housing was unsatisfactory until March 2021. Schroeder further testified that although the respondent did obtain housing and met that goal from March 2021 to August 2021, she did not successfully maintain housing as of November 2021.

¶ 63    Schroeder also testified that the respondent's service plan goal regarding substance abuse was rated unsatisfactory throughout the entire duration of the case. She explained that on multiple occasions, the respondent would obtain substance abuse assessments and then never follow up with treatment. Further, Schroeder testified that the respondent entered an inpatient treatment program in October 2020, but left after five days and never followed up with any outpatient treatment. According to Schroeder's testimony, the respondent would state that her heart condition did not allow her to consistently engage in those services. Schroeder testified that the respondent had been referred for drug screening from June 2019 through September 2021. The respondent had failed to appear seven times; however, she tested negative on the three times that she did appear. According to Schroeder's testimony, this made it difficult to gauge the respondent's progress in this service area.

¶ 64    As to the respondent's service plan goal regarding mental health issues, Schroeder again testified that the respondent was rated unsatisfactory throughout the case. Again, the respondent would complete mental health assessments and then never follow up with treatment. The respondent was referred to mental health services, was inconsistent with meeting with her counselor, and therefore, was discharged unsuccessfully. Schroeder then testified that the service goal regarding parenting was also rated unsatisfactory throughout the entire duration of the case. Although the respondent did engage in some parenting services, her participation was inconsistent, and she was discharged unsuccessfully in October 2021 due to her nonattendance.

¶ 65    Schroeder testified that the respondent was referred to a shelter in December 2019, where she was to receive domestic violence services. However, she did not participate in any services,

25

counseling, or group sessions, and, due to the respondent's arrest for domestic violence in May 2021, she was kicked out of the shelter. The respondent was then referred to another domestic violence service provider but was financially unable to afford those services. Schroeder stated that she had linked the respondent to a third provider for services, but that the respondent had not started an assessment or services yet.

¶ 66 Schroeder further testified that she had never received any verification, doctors' names, or medical notes regarding the respondent's health issues. Rather, the respondent would simply call and state that she was in the hospital. Schroeder stated that on one occasion towards the end of 2021, the respondent sent a photograph of herself in the emergency room because she missed a meeting. This was the only documentation that Schroeder ever received. Schroeder continued, testifying that the goal regarding the respondent's criminal and legal issues was added after her arrest but that, as of August 2021, the goal was rated as unsatisfactory due to the respondent's multiple arrests during 2021.

¶ 67 On cross-examination, Schroeder testified that she had never received a fax from the hospital when the respondent was there. Further, Schroeder stated that she had never been informed by the respondent that she had provided her attorney with such information. When asked by counsel, based upon Schroeder's observations of the respondent's engagement in services, how much time she believed it would take the respondent to successfully complete her services, Schroeder replied, "A long time. Due to lack of engagement in services and unsatisfactory progress."

¶ 68 The respondent then testified on her own behalf. The respondent stated that she would attend visitations when they were provided but, "Like, if I don't make it, it [*sic*] because of my medical issues." According to the respondent's testimony, if she was unable to attend a visit, she would call and let the visitation worker know what was going on and then she would have the

hospital also contact the worker. The respondent reiterated that she had a lot of hospital visits and that she would inform her caseworker of those visits. When asked if she had ever provided her caseworker any documentation regarding her medical issues, the respondent stated that she had brought it with her that day. Further, she stated that she and the caseworker were supposed to have met earlier that week, but the caseworker never called the respondent to set the meeting. According to the respondent's testimony, she had engaged with the minor child during visitations by sitting on the floor and playing with toys with her. The respondent further stated that she had brought things to the visits. According to the respondent's testimony, the minor child would talk about the foster home, but the respondent would say that "we can't talk about that right now. I'm here to spend time with y[ou]."

¶ 69     The respondent explained that she had not been able to fully complete her services because she was a victim of abuse. She stated that Homeward Bound did help her to get stable, but that she had lost her housing due to Nathan's harassing behaviors and his attempt to kick in her door. She further stated that she had been charged with the domestic violence case because she was trying to defend herself. She requested the circuit court to give her more time to complete her services.

¶ 70     At the close of the fitness hearing, the circuit court gave its oral ruling on the record in open court. The circuit court reiterated the clear and convincing standard the State was required to meet in the case. The circuit court noted the testimony of the witnesses. The circuit court stated that its understanding of the evidence was that no service plan was rated overall satisfactory. The circuit court specifically noted that when asked how much time the respondent would need to complete services, Schroeder stated "a long time." The circuit court found that the respondent's visits never progressed and that was due to her lack of engagement and unsatisfactory progress in her service plan. The circuit court found the testimony of the State's witnesses to be credible.

¶ 71 The circuit court then turned to the testimony of the respondent. It noted that the respondent claimed her medical issues presented her with difficulties in complying with the requirements of her service plan. The respondent further claimed to be the victim of domestic abuse, which resulted in her lack of stability. The circuit court found the respondent's testimony to be not credible. It then held that the State had met its burden by clear and convincing evidence in demonstrating that the respondent was an unfit person for the reasons set forth in the State's motion seeking a finding of unfitness and the permanent termination of parental rights.

¶ 72 On February 16, 2022, DCFS filed its best interest report with the circuit court. The best interest report set forth the reasons and circumstances as to why the minor child was taken into protective custody. The best interest report stated that the minor child (and her sister) had resided within the same traditional foster home since the case was opened. The foster parent had gone over and above to ensure the needs of the minor child were met and remained committed to her overall well-being. There had been no placement disruptions during the case and the caregiver had a signed permanency commitment for the minor child (and her sister) to provide permanency through adoption.

¶ 73 The best interest report stated that the minor child was doing well in school, had an individualized education program, and had received additional support for math and reading. The minor child had no behavior issues at school or in the foster home. The minor child attended an after-school program and had been doing well with that. Her medical needs were being met. The minor child had been prescribed glasses and had recently received a new pair. The minor child was up to date on all her medical, dental, vision, and hearing requirements and was healthy overall. The minor child was described as an amazing child and very loving. She was quiet, enjoyed crafts, and loved reading. The minor child also loved to be around animals and to travel with her foster family.

¶ 74   The best interest report indicated that the case passed legal screening on April 7, 2021, and that the foster parent had indicated the desire and willingness to adopt the minor child. The best interest report further noted that the respondent did not engage, make progress, or complete services throughout the duration of the case. Although the respondent had lived out of state for a period of time and had not visited with the minor child, the respondent had engaged in some visitation. Visitation was changed to once per month in March 2021, and the minor child had enjoyed seeing the respondent when she would attend the visit. It was noted that the minor child would try to engage the respondent, but that the respondent had struggled in engagement due to her health issues or would not assist in redirecting the minor child at all. The respondent had enjoyed seeing the minor child when the respondent did attend the visits and brought necessary items. There had been no safety issues during the visitations, and the respondent had been able to meet the basic physical needs, but not the emotional needs, of the minor child.

¶ 75   The best interest report noted that the respondent had consistently disengaged from any mental health services and had been discharged from substance abuse services numerous times, with a most recent assessment in January 2022. The respondent had also been unsuccessfully discharged from her parenting services without any attempt to re-establish any communication or involvement with her service providers. The respondent had never able to demonstrate her ability to be protective of the minor child, or to remain committed to her role as a mother. She had consistently blamed others for the minor child being placed in care and used her health conditions as a barrier and an excuse as to why she had not engaged or made any progress in services. Further, the respondent had consistently disputed all assessments and recommendations made by her service providers. On the contrary, the minor child had maintained her current and only placement since March 29, 2019, and continued to have all of her needs met. The foster parent ensured that all of the minor child's medical, emotional, developmental, and educational needs had continued

to be met daily and provided her with an overabundance of love and support while she had been placed in foster care. DCFS recommended that it was in the minor child's best interests to terminate the respondent's parental rights and for the permanency goal to be changed to adoption.

¶ 76    The circuit court conducted the best interest hearing on March 24, 2022. At the best interest hearing, the circuit court heard testimony from Amy Schroeder, the child welfare specialist with DCFS. Schroeder testified that she was the primary placement worker assigned in this case since August 2019 and, as such, was familiar with the minor child. Schroeder testified that the minor child was in a stable, adoptive placement and had been in the placement since the minor child came into DCFS's care on March 29, 2019. According to Schroeder's testimony, the minor child had been doing really well in the placement and the foster parent did very well with the minor child. The minor child was in school, participating in extracurricular activities, had no major behavioral concerns, and was excelling. The minor child had been receiving passing grades in school with no reported major behavioral issues. According to Schroeder's testimony, the minor child had "turned a new leaf" and was more focused, more engaged, and participated in the classroom.

¶ 77    Schroeder's testimony continued, stating that the minor child was loved, cared for, nurtured, and integrated into the foster family. The foster family included two biological children and the minor child had socialized well within the family. The entire foster family went on family vacations together and the minor child was included in overnight visits with other family members since she identified as being part of the family. The foster parent had provided the minor child's education and medical needs and was committed to providing for the minor child until she reached adulthood. Schroeder stated that the minor child had a very large group of social peers her age at school and participated in an after-school program and in extracurricular activities.

¶ 78    Schroeder confirmed that she prepared the February 16, 2022, DCFS best interest report in anticipation of the best interest hearing. She stated that there were no corrections or changes to the

best interest report. Schroeder then testified that it was in the minor child's best interests to be adopted by her current foster parent, and that it was the opinion of DCFS that the respondent's parental rights be terminated.

¶ 79    On cross-examination, Schroeder testified that, although she was not the visitation worker, she was familiar with the respondent's visitation with the minor child. Based upon her knowledge, Schroeder stated that the minor child had enjoyed seeing the respondent, but Schroeder did not know about any bonding. She also disagreed that the visits between the respondent and the minor child had been positive. Schroeder based her opinion on the fact that, after visits, the minor child had experienced sleep and eating issues. Schroeder's testimony continued, stating that the minor child had enjoyed seeing the respondent; however, the visits were so inconsistent that it had bothered the minor child. Schroeder then explained that the respondent's issues regarding domestic violence were not only perpetrated by others, but also that the respondent had been a part of that domestic violence.

¶ 80    At the close of the best interest hearing, the circuit court gave its oral ruling on the record in open court. The circuit court stated that the State had the burden of proving by a preponderance of the evidence that it was in the best interests of the minor child to terminate the respondent's parental rights. The circuit court referenced the statutory best interest factors of section 1-3 of the Act. 705 ILCS 405/1-3 (West 2020). The circuit court stated that the most applicable factors in this case included the minor child's sense of security, familiarity, continuity, whether the minor child felt a sense of love and attachment, and her need for permanence, including her need for stability and continuity of the relationship with parent figures, siblings, and other relatives.

¶ 81    The circuit court referenced the February 16, 2022, DCFS best interest report, noting that the minor child had been placed in the same foster home since March 29, 2019, where she remained the entire time of the proceedings. She had never been moved or otherwise disrupted in her

31

placement. During the placement, the foster parent had gone above and beyond to ensure the needs of the minor child were met and that the foster parent remained committed to the minor child's overall well-being. The circuit court noted that the foster parent signed a permanency commitment for the minor child (and her sibling) and was committed to providing permanency through adoption, if appropriate. The circuit court continued, noting that the respondent had missed a large portion of her visits when she resided out of state; however, she had engaged in visits when she was in the area. The best interest report indicated that when the visits did occur, the minor child had enjoyed seeing the respondent, which indicated some suggestion or degree of relationship between the minor child and the respondent. Further, the circuit court stated that the respondent had enjoyed seeing the minor child during visits and would bring necessary items for the minor child. No safety issues were noted with the visits, and the basic physical needs of the minor child had been met during the visits. The circuit court found it interesting that the best interest report indicated that the emotional needs of the minor child had not been met during these visits.

¶ 82     Referring to the best interest section of the best interest report, the circuit court again noted that the minor child's placement had been maintained since March 29, 2019, just short of three years. The minor child's medical, emotional, developmental, and educational needs had all been met by the foster parent. The foster parent had also provided the minor child with an abundance of love and support. The circuit court then turned its attention to the testimony of Amy Schroeder that corroborated the written best interest report. Schroeder testified that the minor child was in a stable, adoptive placement and doing well. This included the minor child's schooling and involvement in extracurricular activities. The minor child had no disruptive or disturbing behaviors, had been passing in her schoolwork, and had been excelling. The circuit court stated that the minor child had been placed in a foster family that was loving, caring, and very nurturing. The minor child had integrated into the foster family and enjoyed holidays, vacations, and sibling

visitations, which included overnight visits with extended members of the foster family. Schroeder testified that the minor child was socially well-adjusted with her peers with no fighting and no disruptive or disturbing behaviors. The circuit court noted that it was Schroeder's opinion that it would be in the minor child's best interests to terminate the respondent's parental rights and free the minor child for adoption.

¶ 83 Finally, the circuit court noted that, according to Schroeder's testimony, the minor child had enjoyed seeing the respondent during visits; however, Schroeder did not consider the visitation to have been a positive experience due to the minor child having exhibited sleeping and eating issues after the visits. Despite Schroeder's opinion, the circuit court found that it could not conclude that there was a firm connection or causal relationship between the visits and the sleeping and eating issues. Therefore, the circuit court did not place any significance on this issue. The circuit court found Schroeder's testimony to be credible and, based upon its stated reasons, found that the State had proven, by a preponderance of the evidence, that it was in the best interests of the minor child to terminate the respondent's parental rights. The circuit court then called the case for immediate permanency review and adopted the permanency goal of adoption.

¶ 84 On the same day, March 24, 2022, the circuit court issued a written judgment as to parental fitness and permanent termination. In its written order, the circuit court determined that the respondent was unfit based upon the following relevant findings:

"A. Pursuant to 750 ILCS 50/1(D)(b), [the respondent] ha[s] failed to maintain a reasonable degree of interest, concern, or responsibility as the minor's welfare;

B. Pursuant to 750 ILCS 50/1(D)(m)(i), [the respondent] ha[s] failed to make reasonable efforts to correct the conditions that were the basis for the removal of the minor from the parent during any 9-month period following the adjudication of neglect and/or abuse and or dependency under the Juvenile Court Act of 1987;

33

C. Pursuant to 750 ILCS 50/1(D)(m)(ii), [the respondent] has failed to make reasonable progress toward the return of the minor to the parent during any 9-month period following the adjudication of neglect and/or abuse and/or dependency under the Juvenile Court Act of 1987. The 9-month period is: July 11, 2019–April 11, 2020;

\*\*\*

E. Pursuant to 750 ILCS 50/1(D)(m)(ii), [the respondent] has failed to make reasonable progress toward the return of the minor to the parent during any 9-month period following the adjudication of neglect and/or abuse and/or dependency under the Juvenile Court Act of 1987. The 9-month period is: April 11, 2020–January 11, 2021;

\*\*\*

G. Pursuant to 750 ILCS 50/1(D)(m)(ii), [the respondent] has failed to make reasonable progress toward the return of the minor to the parent during any 9-month period following the adjudication of neglect and/or abuse and/or dependency under the Juvenile Court Act of 1987. The 9-month period is: November 11, 2020–August 11, 2021[.]"

¶ 85   Further, the written order included the circuit court's finding that it was in the best interests of the minor child and the public that all residual rights and responsibilities of the respondent be terminated. As such, the circuit court ordered the termination of the respondent's parental rights and responsibilities, and appointed DCFS as guardian of the minor child with authority to consent to the adoption of the minor child. The circuit court also entered a final permanency report with the goal of adoption.

¶ 86   The respondent now appeals, arguing that the circuit court's findings of unfitness and best interests were against the manifest weight of the evidence.

34

¶ 87                                    II. ANALYSIS

¶ 88                               A. Parental Unfitness

¶ 89    "A parent's right to raise his or her biological child is a fundamental liberty interest, and the involuntary termination of that right is a drastic measure." *In re B'Yata I.*, 2014 IL App (2d) 130558-B, ¶ 28. The Act (705 ILCS 405/1-1 *et seq.* (West 2020)), along with the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2020)), governs the proceedings for the termination of parental rights. *In re D.F.*, 201 Ill. 2d 476, 494 (2002). The Act provides a two-stage process for the involuntary termination of parental rights. 705 ILCS 405/2-29(2) (West 2020). The State must first establish, by clear and convincing evidence, that the parent is an unfit person under one or more of the grounds of unfitness enumerated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)); *In re D.T.*, 212 Ill. 2d 347, 352-53 (2004). Even if the State alleges more than one count of unfitness, only one count needs to be proven to find a parent unfit. *In re J.A.*, 316 Ill. App. 3d 553, 564 (2000). If the court finds the parent unfit, the State must then show that termination of parental rights would serve the child's best interests. *In re B'Yata I.*, 2014 IL App (2d) 130558-B, ¶ 28.

¶ 90    In this appeal, the respondent argues that the circuit court erred in finding that she was an unfit person based upon its determination that she had not made reasonable progress towards the return of the minor child during any nine-month period following the adjudication of abuse or neglect. The respondent also argues that the circuit court erred in finding that the respondent had not made a reasonable effort to correct the conditions that were the basis for the removal of the minor child, and erred in finding that the respondent had not maintained a reasonable degree of interest, concern, or responsibility as to the welfare of the minor child.

¶ 91    We will focus on reasonable progress in this matter, as it is dispositive to the respondent's claim that the circuit court erred in finding her unfit. The respondent argues that there is evidence

of reasonable progress towards the return of the minor child following the nine-month period following the adjudication of neglect, including the nine-month periods of July 11, 2019, to April 11, 2020; April 11, 2020, to January 11, 2021; and November 11, 2020, to August 11, 2021. The respondent cites to the testimony at the fitness hearing where it was stated that she attended her visits and how the minor child enjoyed seeing the respondent. During these visits, the respondent would do the minor child's nails and hair, and provided food for the minor child.

¶ 92 The respondent also cites to the testimony that indicated that she obtained several substance abuse assessments and participated in domestic violence services. The respondent argues that the evidence at the fitness hearing demonstrated that her random drug tests were negative for any illicit or illegal substances. The respondent argues that her progress, while suffering from a heart condition, demonstrated that she made more than reasonable progress.

¶ 93 Section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2020)) provides for finding a parent unfit where the parent has failed to make reasonable progress towards the return of the child during any nine-month period following the adjudication of neglect. *In re J.A.*, 316 Ill. App. 3d at 564. The State bears the burden of proving by clear and convincing evidence that the parent is unfit, and we may affirm if the evidence supports a finding of unfitness on any one of the alleged statutory grounds. *In re B'Yata I.*, 2014 IL App (2d) 130558-B, ¶¶ 29, 39.

¶ 94 Reasonable progress is an objective standard that focuses upon the amount of progress measured from the conditions existing at the time custody was taken from the parent. *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17. Measuring reasonable progress under section 1(D)(m)(ii) of the Adoption Act encompasses the parent's compliance with the service plans in light of the conditions giving rise to the removal of the minor child, while also considering other conditions which may later arise preventing the return of the child to the parent. *Id*. A parent's failure to substantially fulfill his or her obligations under the service plan is substantially a parent's failure to make

36

reasonable progress toward the return of the minor child. *Id*. "Reasonable progress requires, at minimum, measurable or demonstrable movement toward the goal of reunification." *In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 21. Reasonable progress will be found when a trial judge concludes that the judge will be able to order the child returned to parental custody in the "near future." *Id*.

¶ 95 Further, a determination of parental unfitness involves factual findings and credibility assessments that the circuit court is in the best position to make, and a finding of unfitness will not be reversed unless it is against the manifest weight of the evidence. *In re Tiffany M.*, 353 Ill. App. 3d 883, 889-90 (2004). "A factual finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the determination is unreasonable, arbitrary, and not based on the evidence." *Id*. at 890.

¶ 96 In this matter, we find that the circuit court's finding that the respondent had not made reasonable progress towards the return of the minor child during any nine-month period following the adjudication of neglect is supported by the manifest weight of the evidence. Whether a parent has made reasonable progress may be examined in light of any nine-month period after the adjudication of neglect (750 ILCS 50/1(D)(m)(ii) (West 2020)), and this court may affirm the circuit court's judgment on any basis established by the record (*In re K.B.*, 314 Ill. App. 3d 739, 751 (2000)).

¶ 97 The respondent argues on appeal that she attended her visits and the minor child had enjoyed seeing the respondent. During these visits, the respondent would do the minor child's nails and hair, and provided food for the minor child. Although this may be true, the testimony presented at the fitness hearing was that the respondent's attendance was sporadic and inconsistent. In fact, due to the respondent's inconsistent attendance, her visits were changed from weekly to every two weeks, and then to monthly with the requirement that the respondent contact the visitation worker prior to the visit to confirm the respondent's attendance. Further, there was testimony presented

37

that the respondent failed to properly engage with the minor child during the visits and would sometimes become irritated during the visits. There was also testimony that the respondent would claim her missed visits were due to her medical condition or being in the hospital; however, she never provided her caseworkers with any verifying information or documentation.

¶ 98    The respondent also argues that she had obtained several substance abuse assessments, tested negative on her random drug tests, and participated in domestic violence services. The evidence presented at the fitness hearing, however, demonstrated that the respondent would obtain substance abuse assessments and then never follow up with treatment. Further, the evidence established that the respondent entered an inpatient treatment program in October 2020, but left after five days and never followed up with any outpatient treatment, stating that her heart condition did not allow her to consistently engage in those services. As for her drug screening, although the respondent tested negative on the three occasions, she failed to appear seven times for screening. The respondent was also referred to domestic violence services, but did not participate in any services, counseling, or group sessions and, due to the respondent's arrest for domestic violence, she was required to leave the shelter.

¶ 99    The respondent's service plan goals included obtaining mental health services, and she was rated unsatisfactory throughout the entirety of the case. Again, the respondent would complete mental health assessments and then never follow up with treatment. The respondent was referred for mental health services but was inconsistent in meeting with her counselor and was discharged unsuccessfully. The respondent's service plan included a goal regarding parenting which was also rated unsatisfactory throughout the entirety of the case. Although the respondent did engage in some parenting services, her participation was inconsistent, and she was discharged unsuccessfully due to her nonattendance. Further, the respondent was to obtain, and maintain, stable housing. Although the respondent did obtain housing and met that goal from March 2021 to August 2021,

38

she was again without stable housing as of November 2021. The respondent's communication with her caseworkers remained inconsistent throughout the case, making it extremely difficult for the caseworkers to assist the respondent in obtaining and maintaining services.

¶ 100   The respondent's arguments on appeal are not supported by the various reports submitted to the circuit court and the testimony at the circuit court's fitness hearing. As stated above, the circuit court was in the best position to make a credibility assessment of the respondent's testimony along with the testimonies of the respondent's caseworkers. In this matter, the respondent was permitted almost three years from the time the minor child was taken into DCFS's care to complete her service plan and failed to do so. At the end of the lengthy period of time that the minor was in care, the circuit court was no closer to being able to conclude that the child would be returned to parental custody in the near future.

¶ 101   Therefore, we find that the circuit court's finding that the respondent was an unfit person as defined in section 1(D)(m)(ii) of the Adoption Act based on the respondent's failure to make reasonable progress towards the return of the minor child during any nine-month period following the adjudication of neglect was not contrary to the manifest weight of the evidence. As noted above, only one count of unfitness needed to be proven for the circuit court to find that the respondent was an unfit person. *In re J.A.*, 316 Ill. App. 3d at 564. Because we have determined that the circuit court's finding that the respondent was an unfit person for failing to make reasonable progress towards the return of the minor children during any nine-month period following the adjudication of neglect was not unreasonable, we do not need to address the respondent's remaining issues relating to parental unfitness.

¶ 102                              B. Best Interest Determination

¶ 103   After a circuit court enters an order finding a parent unfit, it must determine whether termination of parental rights is in the minor's best interests. *In re B'Yata I.*, 2014 IL App (2d)

39

130558-B, ¶ 28. Section 1-3(4.05) of the Act (705 ILCS 405/1-3(4.05) (West 2020)) sets forth the various factors for the circuit court to consider in assessing a child's best interests. *In re B'Yata I.*, 2014 IL App (2d) 130558-B, ¶ 41.

¶ 104   In determining the best interests of the child, the circuit court must consider the following statutory factors within the context of the child's age and developmental needs: (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties; (4) the child's sense of attachments, including where the child feels love, attachment, and a sense of being valued, the child's sense of security, the child's sense of familiarity, the continuity of affection for the child, and the least disruptive placement alternative for the child; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, which includes a need for stability and continuity of relationships with parent figures, siblings, and other relatives; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the persons available to care for the child. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072 (2006); see also 705 ILCS 405/1-3(4.05) (West 2020).

¶ 105   The State bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the best interests of the minor child. *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009). A circuit court's best interests finding will not be disturbed on appeal unless it is against the manifest weight of the evidence. *Id*. A decision is against the manifest weight of the evidence only if an opposite conclusion is clearly apparent. *Id*.

¶ 106   The circuit court is not required to make specific findings of fact concerning the best interest factors as long as there is some indication in the record that it considered the enumerated factors when making the best interest determination. *In re Marriage of Stribling*, 219 Ill. App. 3d 105, 107 (1991). In this matter, after carefully reviewing the record and in light of the best interest

factors that must be considered, we do not find that the circuit court's determination to terminate the respondent's parental rights was against the manifest weight of the evidence.

¶ 107 The respondent argues that the trial court's ruling, finding that termination of parental rights was in the minor's best interests, was against the manifest weight of the evidence. The only argument that the respondent offers in support of that assertion is that the minor child had enjoyed her visits and that it is in the minor child's best interests to grow up with a mother who loves her. The circuit court heard the testimony regarding the love and bond the minor child shared with her foster parent and foster family. The circuit court also heard the testimony regarding how well-adjusted, loved, and cared for the minor child was, both physically and emotionally, in her current foster placement. The circuit court heard testimony regarding the minor child's current home, stability, and permanency. The minor child was in school, participated in extracurricular activities, had no major behavioral concerns, and was excelling. According to the testimony, the minor child had "turned a new leaf" and was more focused, more engaged, and participated in the classroom. The testimony at the best interest hearing demonstrated that the minor child was loved, cared for, nurtured, and integrated into the foster family, which included two biological children and that the minor child socialized well with within the family. The entire foster family would go on family vacations together, and the minor child was included in overnight visits with other family members since she identified as being a part of the family.

¶ 108 The circuit court, having observed the witnesses' testimony, is in the best position to weigh this evidence. *In re Julian K.*, 2012 IL App (1st) 112841, ¶ 66. The respondent does not allege, nor does the record indicate, that the circuit court failed to consider the enumerated factors when making the best interests determination. The circuit court evaluated the testimony related to the above considerations and found that they did not outweigh the evidence in favor of termination by a preponderance of the evidence.

¶ 109   Based on the above analysis, we find that the circuit court's judgment that termination of the respondent's parental rights was in the minor child's best interests was not contrary to the manifest weight of the evidence.

¶ 110                               III. CONCLUSION

¶ 111   Based on the above, we find that the circuit court's judgment that the respondent was an unfit person based upon its determination that the respondent failed to make reasonable progress for the return of the minor child during any nine-month period following the adjudication of neglect and that it was in the best interests of the minor child to terminate the respondent's parental rights was not contrary to the manifest weight of the evidence. Therefore, we affirm the judgment of the circuit court.

¶ 112   Affirmed.